**Lester CHAMBERS d/b/a The Chambers Brothers, Carl Gardner d/b/a The Coasters, Bill Pinkney d/b/a The Original Drifters, Tony Silvester d/b/a The Main Ingredient, on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**TIME WARNER, INC., in its own right and as successor in interest to Warner Bros. Records, Atlantic Records, Elektra Records, and associated labels; Sony Music Entertainment, Inc. in its own right and as successor in interest to Columbia Records and associated labels; BMG Entertainment, Inc., in its own right and as successor in interest to RCA Records, Arista Records, and associated labels; Universal Music Group, Inc. in its own right and as successor in interest to MCA Records, Polydor Records, and associated labels; and MP3.Com, Inc., Defendants.**

No. 00 CIV. 2839(JSR).

United States District Court,
S.D. New York.

Dec. 4, 2000.

Fred Taylor Isquith, Wolf Haldenstein Adler Freeman & Herz LLP, New York City, Lawrence Feldman, Lawrence E. Feldman & Associates, Jenkintown, PA, Mark C. Rifkin, Rifkin & Associates LLC, Paoli, PA, for Plaintiffs.

Jeffrey A. Conciatori, Michael Carlinsky, Orrick, Herrington & Sutcliffe LLP, New York City, for MP 3.Com, Inc.

Jay Cohen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Sony Corp.

Katherine B. Forrest, Cravath Swaine & Moore, New York City, for Time Warner, Inc.

Charles B. Ortner, Proskauer Rose LLP, New York City, for BMG Music.

Suzan Arden, Pryor Cashman Sherman & Flynn, New York City, Russell J. Frackman, Jeffrey D. Goldman, Mitchell Silberberg & Knupp LLP, Los Angeles, CA, for Universal Music Group, Inc.

Michael G. Rhodes, James J. Donato, Cooley Godward LLP, San Diego, CA.

## OPINION AND ORDER

RAKOFF, District Judge.

Plaintiffs are members of musical groups that, pursuant to contract, made recordings, mostly in the 1950's and '60's, for defendant companies Time Warner, Inc. ("Time Warner"), Sony Music Entertainment, Inc. ("Sony"), BMG Entertainment, Inc. ("BMG"), Universal Music Group, Inc. ("Universal") and their predecessors (collectively "the Record Companies"). Spurred by the actions of co-defendant MP3.com, Inc. ("MP3.com") in converting such recordings to digital format, *see UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F.Supp.2d 349 (S.D.N.Y.2000), plaintiffs brought this action under federal copyright law, federal trademark law, and sections 50 and 51 of the New York State Civil Rights Law, seeking not only monetary damages and injunctive relief but also a declaration of their rights under these laws with respect to Internet use of such of their recordings as were made before February 1, 1996 (the effective date of the Digital Performance Rights in Sound Recordings Act of 1995). Defendants responded by moving to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6).[1] For the following reasons the motion is granted.

1. Contemporaneously plaintiffs moved for class certification, but subsequently agreed to suspend that motion pending the Court's resolution of defendants' motion to dismiss. The Court's resolution of the latter motion renders the class certification motion moot.

■ Although plaintiffs' Amended Complaint asserts no fewer than nine separate counts, most of their claims are premised on the contention that the plaintiffs hold property rights in the digital versions of their recordings. In fact, however, plaintiffs assigned such rights to the Record Companies.

The recordings in question were made pursuant to contracts between the plaintiffs and the Record Companies, under which the Record Companies advanced monies to the plaintiffs to make the recordings and agreed to pay royalties to plaintiffs for certain uses of the recordings, in return for transfer of ownership of the recordings to the Record Companies. *See, e.g.,* Am. Compl. ¶¶ 15, 19–21.[2] While the contracts vary from one another in ways not here relevant, they all contain language identical or equivalent to the following:

> All recordings, phonograph record masters and reproductions made therefrom, together with the performances embodied therein, shall be entirely [the Record Company's] property. [The Record Company] shall have the unrestricted right to manufacture, use, distribute and sell sound productions of the performances recorded hereunder made by any method now known, or hereafter to become known . . .

Aff. of Katherine B. Forrest, Ex. 1, at ¶ 5 (Atlantic Contract); *see also, e.g., id.,* Ex. 8, at ¶ 4 (Columbia Contract); *id.,* Ex. 9, at ¶ 13 and Ex. 11, at ¶ 9(f) (RCA Contracts); *id.,* Ex. 13, at § 5.01 (PolyGram Contract).

This language (and the equivalent language in the other contracts) is clear. Without limitation it conveys all of plaintiffs' rights in these recordings to the Record Companies, including the right to exploit the recordings by any method whatsoever, whether known at the time or "hereafter to become known."

Despite their best efforts, plaintiffs are unable to offer any argument that defeats the plain meaning of this contractual language. Most of their arguments, indeed, are premised on trivial differences in the wording of the various contracts that in no way alters the basic meaning here relevant. For example, plaintiff Pinkney argues that the clause in the contract he signed with Atlantic Records (a predecessor of defendant Time Warner) that gives Atlantic the exclusive right to manufacture and sell "records embodying the Recordings" refers only to vinyl records and not to digital recordings. *See* Aff. of Silda Palerm, Ex. 1, at ¶ 1(a) (Pinkney contract with Atlantic). Even if this were true in the case of this one contract, it would have limited application to the rest of this case, since other contracts expressly define "records" more liberally.[3] But even in the case of Pinkney's own contract, the restrictive meaning he posits for "records" is refuted by the rest of the very sentence on which he relies, which gives Atlantic the right to manufacture such records "by any method now or hereafter known." *Id.* at ¶ 1(a). Similarly, the contract also gives Atlantic the right "[t]o perform the records publicly and to permit public performances thereof by means of radio

---

**2.** Because the contracts are referred to and effectively incorporated by reference in the Amended Complaint, they may be considered on a motion under Rule 12(b)(6). *See, e.g., International Audiotext Network, Inc. v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995).

**3.** For example, plaintiff Silvester's recording contracts with RCA (a predecessor of defendant BMG) each defines a "record" as:

> any reproduction of a master recording in any form now known or later developed in which sounds with or without visual images

are fixed by any method now known or later developed and from which sounds with or without visual images can be perceived, reproduced, or otherwise communicated either directly or with the aid of a machine or device and includes the material object in which sounds with or without visual images are fixed, including but not limited to disc records, sound tracks, film, tape and tape cartridges.

Forrest Aff., Ex. 9 at ¶ 17(c); Ex. 10 at ¶ 27(c); Ex. 11 at ¶ 27(b)(i); Ex. 12 at ¶ 23(b).

broadcast, television or any other method, medium or technology now or hereafter known." *Id.* at ¶ 1(e). Finally, definitions of "records" quite aside, the contract provides generally that Atlantic owns "all rights, title and interests in and to the Recordings and all reproductions derived therefrom and performances embodied therein, from the inception of recording thereof, free and clear from the claims of you or anyone claiming through you." *Id.* at ¶ 1. Reading these provisions together, no reasonable person could understand the contract to assign only the rights relating to vinyl records, with plaintiffs retaining the digital rights.[4]

Perhaps recognizing the poverty of such arguments, plaintiffs' counsel, at oral argument on the instant motion, essayed a new contention to the effect that the above-discussed contractual language, even if facially sufficient to encompass digital versions of the recordings, is effectively narrowed by the definition of "recording" contained in some of the versions of the National Code of Fair Practice for Sound Recordings of the American Federation of Television and Radio Artists' (the "AFTRA Code"). Despite the untimeliness of this argument, the Court has therefore reviewed both the versions of the AFTRA Code that plaintiffs submitted in connection with the plaintiffs' motion for class certification as well as those submitted after oral argument of the instant motion. Quite aside from the fact that the Record Companies do not appear as signatories on any of these versions, however, there is no language in any of them that may be held to narrow, or override, the plain language of the recording contracts discussed above. At most, they show that prior to 1965 (when some, but not all, of the recording contracts here in issue were entered into) the AFTRA Code's own definition of "recordings" was arguably limited to phonograph recordings. But, as all versions of the Codes state, the Codes merely set forth the minimum required terms for the recording contracts they cover and are in no way intended to prohibit broader provisions or definitions.

Finally, after the instant motion had been fully submitted, plaintiffs sought (and received) permission to submit several additional cases that, they represented, would contradict the interpretation favored by the Court. But the cases they then submitted—notably, *Manners v. Morosco*, 252 U.S. 317, 325–27, 40 S.Ct. 335, 64 L.Ed. 590 (1920), *Harper Bros. v. Klaw*, 232 F. 609, 612–13 (S.D.N.Y.1916), and *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 165–68 (N.Y.1933)—do nothing of the kind. Rather, these old cases deal with the construction of contracts that, unlike the contracts here, made no provision for the future reproduction of assigned works "by any method now known, or hereafter to become known," or words to that effect. Obviously in the absence of such language courts might be hard pressed to determine that reproduction of recordings by a new method such as a digital recording was covered by the assignment. But where, as in the instant case, such language is present, courts have had no difficulty in construing these contracts to extend the assignment to reproductions of the recordings by new methods or in new mediums. *See, e.g., Batiste v. Island Records, Inc.*, 179 F.3d 217, 223 (5th Cir. 1999); *Muller v. Walt Disney Productions*, 871 F.Supp. 678, 682 (S.D.N.Y.

---

4. Plaintiffs' parallel claims that the Record Companies lack the right to use plaintiffs' names and likenesses in connection with digital reproductions of the recordings are similarly refuted by similarly broad provisions in their contracts that expressly authorize the use of plaintiffs' names and likenesses "in connection with the advertising, sale and exploitation of the performances recorded here-

under and the reproductions therefrom." Forrest Aff., Ex. 1 at ¶ 6. Nothing in this language (or its equivalent in certain of the contracts) remotely suggests that such rights are limited (as plaintiffs argue) to use of plaintiffs' names and likenesses in the sale of vinyl records, or (as plaintiffs also argue) that the rights have expired.

1994); *Rooney v. Columbia Pictures Indus., Inc.*, 538 F.Supp. 211, 223–26 (S.D.N.Y.), *aff'd,* 714 F.2d 117 (2d Cir. 1982) (table).

In short, the Court concludes that the plaintiffs have contractually assigned to the Record Companies all of plaintiffs' rights in the digital reproductions of the recordings here in issue (as well as the right to use plaintiffs' names and likenesses in connection therewith). This conclusion, in turn, mandates dismissal of most of plaintiffs' claims. There are just three exceptions. The first is plaintiffs' claim that the Record Companies, by creating and marketing compact discs that allow customers to copy the works recorded therein without sacrificing quality, have breached contractual and fiduciary duties under state and common law to protect the copyrights of the artists' works and, in turn, the royalty stream that flows to the artists from the legitimate sale of those works. *See, e.g.,* Pls.' Mem. at 41–53. While the Court is skeptical of an argument that, taken to its logical end, would lead to the destruction of most existing compact discs, it need not reach the issue; for, having disposed above of all of plaintiffs' claims against the Record Companies that are grounded in federal law, the Court declines to exercise supplemental jurisdiction over these remaining claims grounded in state law.

 Second, plaintiffs claim that defendant MP3.com, which had no contractual relation with plaintiffs, violated the Lanham Act's prohibitions against false description of goods and services and false designation of origin in the following respect:

> [W]hen the any· [*sic* ] of the plaintiffs' names are typed into the search engine on MP3.com's website, a box appears with the following language: *"Want to hear [artist's name] on-line? Try My .MP3.com, where you can beam your CDs and listen to them anytime, anywhere."*

Am. Compl. ¶ 66. Plaintiffs argue that by including the artist's name in this language, MP3.com creates a false impression in the user of the database that the artist endorses the service or has some other relationship with it.[5] *See generally Oliveira v. Frito–Lay, Inc.*, No. 96 Civ. 9289, 1997 WL 324042 (S.D.N.Y.1997); *Rostropovich v. Koch Intern. Corp.*, No. 94 Civ. 2674, 1995 WL 104123 (S.D.N.Y.1995).

The Court finds, however, as a matter of law, that the above-described language is simply a permissible "nominative use," *i.e.*, a fair use of the artist's name as a necessary means of accurately identifying the inventory in question offered by MP3.com. *See New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). Accordingly, the Lanham Act claim must be dismissed.

Third, plaintiffs also assert various state law claims against defendant MP3.com, such as for alleged violations of sections 50 and 51 of the New York Civil Rights Law, as well as for alleged misappropriation and palming off. The Court, however, declines to exercise supplemental jurisdiction over these pendent state claims given the dismissal of the federal Lanham Act claim.

For the foregoing reasons, the Court hereby dismisses with prejudice all federal claims against defendants (Counts I, II, III, V, and VII of the Amended Complaint) and dismisses without prejudice all state law claims against the defendants (Counts IV, VI, VIII, and IX of the Amended Complaint). Clerk to enter judgment.

SO ORDERED.

---

5. Only when a user requests a particular recording of that artist is the user then presented with a disclaimer reading "MP3.com does not purport to own any rights in or to the aforementioned artist's name, nor does it intend to imply said artist's endorsement or sponsorship of MP3.com, its products or services."